United States District Court
Southern District of Texas
**ENTERED**
May 09, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE SPEEDCAST INTERNATIONAL LIMITED, ET AL., § § § § | |
| Reorganized Debtors. § § § | |
| INMARSAT GLOBAL LIMITED, ET AL., § § § | CIVIL ACTION NO. H-22-00008 BANKRUPTCY CASE NO. 20-32243 |
| Appellants, § § § | |
| VS. § § § | |
| SPEEDCAST INTERNATIONAL LIMITED, ET AL., § § § § | |
| Appellees. § | |

## MEMORANDUM AND OPINION

This bankruptcy appeal presents a narrow issue of contract interpretation. Inmarsat Global Limited and Speedcast International Limited entered into an Asset Sale Agreement and Deed of Termination and Release that released Inmarsat's past, present, and future claims against Speedcast, except for a narrow set of "Permitted Claims." The bankruptcy court held that Inmarsat's administrative expense claim for a "Shortfall Amount" of $2,161,890 against Speedcast was not a "Permitted Claim." Inmarsat appealed, arguing that its administrative expense claim was allowed under the parties' agreements.

Based on the briefs, the contracts, and the applicable case law, this court agrees with the bankruptcy court that Inmarsat's administrative expense claim is not a "Permitted Claim," and that Inmarsat has released any claim for "Shortfall Amounts." The bankruptcy court's order denying

Inmarsat's administrative expensive claim, (Bankr. Ct. Docket Entry No. 1799), is affirmed. The reasons are set out below.

I.     **Background**

The facts in this bankruptcy appeal are largely undisputed. Inmarsat and its affiliates sell satellite services that are used on ships, planes, and other "enterprises on land." (Bankr. Ct. Docket Entry No. 1640, at 2). Speedcast purchases satellite services from Inmarsat at wholesale prices and sells them on a retail basis to end users. (*Id.*). Inmarsat provides its satellite services to Speedcast "under various master service agreements . . . including the Master Supply Agreement between Inmarsat Limited and Speedcast Limited, effective November 1, 2018." (*Id.*).

"In connection with Inmarsat's launch of a new maritime service, the FX Services, [Inmarsat and Speedcast] entered into a Strategic Alliance Agreement effective June 10, 2016." (*Id.*). The Strategic Alliance Agreement provided for a 30% discount on "FX Services delivered under the [master service agreements]." (*Id.*, at 2–3). This Agreement "also required Speedcast to meet certain minimum targets for deploying FX Services at the end of each calendar year." (*Id.*, at 3). If Speedcast did not meet those minimum targets, "Speedcast was obligated to pay certain 'shortfall amounts' to Inmarsat." (*Id.*). The parties refer to this as Speedcast's "take-or-pay" obligation. (Appellant Br., at 7).

Speedcast and its affiliates filed chapter 11 cases in the bankruptcy court on April 23, 2020. During the course of the bankruptcy proceedings, Inmarsat continued to sell FX services to Speedcast. (Appellant Br., at 8). Speedcast and Inmarsat also entered into an Asset Sale Agreement and a Deed of Termination and Release, under which Speedcast sold various assets and assigned some of its existing customer contracts to Inmarsat in exchange for payment and a mutual release of past, current, and future claims. (Appellant App'x, at 2).

The releases under the Deed of Termination and Release are broad, relieving the parties of "any and all claims, actions, causes of action . . . whether known or unknown . . . disputed or undisputed, based on law or equity . . . existing at any time, whether asserted or unasserted after the Effective Date." (Docket Entry No. 2-1, at 92). The only claims not released under the Deed of Termination and Release are "Permitted Claims," which are defined as:

> [A]ny claims for payment by an Inmarsat Entity for services delivered by the relevant Inmarsat Entity to a SpeedCast Entity after 23 April 2020 under, and otherwise on the terms of, any Existing Agreement or the Surviving Agreement, including any applicable interest, fees or costs relating to such payment claims which are, or become, due and payable under the terms of the relevant Existing Agreement or the Surviving Agreement (as applicable).

(*Id.*).

On April 9, 2021, Inmarsat filed an administrative expense claim in the bankruptcy court, claiming that Speedcast owed a Shortfall Amount of $2,161,890 for failing to meet minimum satellite distribution targets for 2020 under the Strategic Alliance Agreement. (Docket Entry No. 1640, at 6). Speedcast argued that the bankruptcy court should deny the claim because the Shortfall Amount was not a "Permitted Claim" under the Deed of Termination and Release. The parties agree that if the Shortfall Amount was not a "Permitted Claim," then Inmarsat was not entitled to its payment.

The bankruptcy court concluded that "Inmarsat's shortfall claim [was] not a Permitted Claim as defined in the Deed of Termination and Release." (Docket Entry No. 1798, at 5). The court wrote:

> Under the Deed of Termination and Release, a Permitted Claim is one "for services delivered . . . under, and otherwise on the terms of . . . any Existing Agreement or the Surviving Agreement . . . ." The phrase "under, and otherwise on the terms of" implies that the services must be delivered both "under" and "otherwise on the terms of" an Existing Agreement or the Surviving Agreement to qualify as a Permitted Claim. . . . Without the guidance of mutual intent nor reason to depart from the ordinary interpretation, "and" is conjunctive in the Permitted Claim

3

> definition. Inmarsat delivered its services under the Master Service Agreements, not the Strategic Alliance Agreement. The Shortfall Amount arises under the terms of the Strategic Alliance Agreement. Because the services were not delivered "under" the Strategic Alliance Agreement, the "terms of" the Strategic Alliance Agreement are irrelevant to the resolution of this dispute. The services were delivered both "under" and "otherwise on the terms of" the Master Service Agreements, but the Master Service Agreements provide no basis upon which Inmarsat may seek the Shortfall Amount. Because (1) no services were delivered under the Strategic Alliance Agreement; (2) a Permitted Claim is one for services delivered under, and otherwise on the terms, of an Existing Agreement or the Surviving Agreement; and (3) the Master Service Agreements do not provide for a Shortfall Amount, Inmarsat's shortfall claim is not a Permitted Claim as defined in the Deed of Termination and Release.

(Bankr. Ct. Docket Entry No. 1798, at 3–5).

Inmarsat appeals, arguing that "[t]he Bankruptcy Court should have allowed the Administrative Expense Claim for the entire Shortfall Amounts." (Appellant Br., at 15). Inmarsat argues that the Strategic Alliance Agreement is "an 'Existing Agreement,'" and that the Deed of Termination and Release permitted Inmarsat to bring claims "for payment . . . for services delivered . . . ***under, and otherwise on the terms of, any Existing Agreement*** . . . ." (*Id.*, at 14, 15 (emphasis in original)). Inmarsat argues that "the word 'and' should be read in the 'several' sense with reference to the agreements." (*Id.*, at 15).

Under Inmarsat's proposed reading of "Permitted Claims," the bankruptcy court erred in concluding that "the 'terms of' the Strategic Alliance Agreement [were] irrelevant to the resolution of this dispute," because a "Permitted Claim" can arise under either the Master Service Agreement or the Strategic Alliance Agreement. Because Inmarsat's services were delivered *under* the Master Service Agreements, but also *on the terms of* the Strategic Alliance Agreement,[1] Inmarsat argues that it can bring a claim for the Shortfall Amount under the Strategic Alliance Agreement.

---

[1] For example, the discounted pricing of the "FX [S]ervices . . . delivered to Speedcast" was set out in the Strategic Alliance Agreement, not the Master Service Agreements. (Appellant Br., at 13).

4

## II.     The Legal Standards of Review

"Traditional appellate standards" apply to a district court's review of a bankruptcy court's order under 28 U.S.C. § 158(a). *Stern v. Marshall*, 564 U.S. 462, 475 (2011). This court reviews the bankruptcy court's conclusion of law de novo and its findings of fact for clear error. *See, e.g.*, *In re Ahern Enters., Inc.*, 706 F.3d 817, 820 (5th Cir. 2007); *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003); *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). "Contract interpretation is a purely legal issue; accordingly [this court] review[s] the district court's interpretation of a contract *de novo*." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

The parties did not brief, and the bankruptcy court did not address, which law governs the contracts at issue. The Asset Sale Agreement states that the "agreement and all legal actions or proceedings based upon, arising out or of related or incidental to any transaction contemplated hereby . . . shall be exclusively governed by, construed, performed and enforced in accordance with the laws of the State of New York." (Appellant App'x, at 105). Whether Texas law or New York law governs, the basic principles of contract interpretation are the same.

Texas and New York law on contract interpretation both require that "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir. 2016) (ellipses and internal quotation marks omitted); *see Terry Black's Barbeque, L.L.C. v. State Auto. Mutual Ins. Co.*, 22 F.4th 450, 454–55 (5th Cir. 2022). "Agreements are construed in accord with the parties' intent, and the best evidence of what parties to a written agreement intend is what they say in their writing." *Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 140 N.E.3d 511, 519 (N.Y. 2019) (internal quotation marks and brackets omitted). If the contract terms are clear and unambiguous, the parties' intent "must be found within the four

5

corners, giving a practical interpretation to the language employed and reading the contract as a whole." *Tomhannock, LLC v. Roustabout Res., LLC*, 128 N.E.3d 674, 675 (N.Y. 2019) (quoting *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014)). If the terms are ambiguous and there is "relevant extrinsic evidence as to the parties' intent, the proper interpretation of the disputed language becomes a question of fact." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 391 (S.D.N.Y. 2014), *aff'd sub nom. APEX Employee Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc.*, 725 F. App'x 4 (2d Cir. 2018).

**III.    Analysis**

Under the "Permitted Claims" clause, Speedcast is not released from "any claims for payment by an Inmarsat Entity for services delivered by the relevant Inmarsat Entity to a SpeedCast Entity after 23 April 2020 under, and otherwise on the terms of, any Existing Agreement . . . ." (Docket Entry No. 2-1, at 92). The parties focus on the meaning of the phrase "and otherwise on the terms of." Inmarsat argues that "and otherwise on the terms of" means "or," so that Speedcast can seek claims for payment under the Master Service Agreements *or* on the terms of the Strategic Alliance Agreement. (Appellant Br., at 15–16). Speedcast argues that "and otherwise" is used in the conjunctive, so that Inmarsat's claim for payment must arise under an Existing Agreement and on the terms of an Existing Agreement. Because Inmarsat delivered services only under the master service agreements, Inmarsat is limited to claims arising under the master service agreements. Inmarsat's claim for a Shortfall Amount is prohibited because it arises solely from the Strategic Alliance Agreement.

The clear and unambiguous terms of the "Permitted Claims" clause support Speedcast's arguments. The phrase "and otherwise on the terms of" is offset by commas and is best read in the conjunctive, requiring a claim to be for services under an agreement, and otherwise on the

6

terms of, an agreement. Because services are delivered only under the Master Service Agreements, and not the Strategic Alliance Agreement, Inmarsat cannot bring a claim for payment that arises only under the Strategic Alliance Agreement.

The "Permitted Claims" clause, moreover, allows Inmarsat to seek payment only "for *services delivered by* the relevant Inmarsat Entity to a Speedcast Entity." The Shortfall Amount is not for "services delivered by [Inmarsat] to [Speedcast]." The Shortfall Amount is a penalty for services that Inmarsat did not deliver to Speedcast, because Speedcast was unable to find enough purchasers for those services. The clear language of "Permitted Claims" does not encompass claims for Shortfall Amounts.

Even if Inmarsat's arguments suggest that the "Permitted Claims" clause is ambiguous, the evidence as to the parties' intentions on entering into the Asset Sale Agreement support Speedcast's position that claims for Shortfall Amounts were released under the Deed of Termination and Release. The motion for the bankruptcy court to approve the Asset Sale Agreement between Inmarsat and Speedcast explained that:

> [t]he prospect for future profitability of the Inmarsat reseller business is speculative and contingent upon adding new customers and meeting certain minimum levels of customer renewals to avoid substantial penalties under existing contractual arrangements between [Speedcast] and Inmarsat. [Speedcast does] not anticipate such targets being met. Based on these factors, [Speedcast] entered into negotiations with Inmarsat regarding a potential sale of, among other things, the Inmarsat Services, including a transfer of the Assets (as defined in the Asset Sale Agreement) . . . .

(Appellant App'x, at 5).

Put differently, the parties negotiated the Asset Sale Agreement and Deed of Termination and Release because Speedcast did not anticipate being able to meet its "take-or-pay" obligations. (*See also* Bankr. Ct. Docket Entry No. 1641, at 2 ("As expressly agreed by the parties and documented in the express terms of the Termination Agreement . . . one of the primary reasons the

Debtors entered into the Inmarsat Transaction was to receive relief from their 'take-or-pay' obligations (i.e., the Shortfall Amounts), in the [Strategic Alliance Agreement] in the form of broad, mutual releases.")).  Under the Asset Sale Agreement, Speedcast transferred many of its customers to Inmarsat.  If Speedcast feared that it could not meet its distribution targets before it assigned its customers to Inmarsat, then it is even less likely that Speedcast could meet those distribution targets after transferring the customers.  Inmarsat argues nonetheless that Speedcast remains beholden to the take-or-pay obligations that predated the Asset Sale Agreement.  This appears inconsistent.

If the parties entered into the Asset Sale Agreement because Speedcast did not anticipate meeting its distribution targets, it is inconsistent to find that Speedcast remains liable for its take-or-pay obligations after signing the Asset Sale Agreement.  The documents support interpreting the contracts to mean that the Asset Sale Agreement and the Deed of Termination and Release released Speedcast for future penalties arising under the Strategic Alliance Agreement in exchange for Speedcast transferring existing customers to Inmarsat, while at the same time requiring Speedcast to pay for services that Inmarsat did deliver.  To allow Inmarsat to seek the Shortfall Amount as a "Permitted Claim" would be counter to the parties' intent in entering into the Asset Sale Agreement and the Deed of Termination and Release.

## IV.    Conclusion

Because the clear and unambiguous language of the Deed of Termination and Release does not allow Inmarsat to seek payment of a "Shortfall Amount" under the Strategic Alliance Agreement, the court affirms the bankruptcy court's order denying Inmarsat's Administrative

Expense Claim.

SIGNED on May 9, 2022, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge